No. **SR-CV-99-94**

# District Court of the Navajo Nation

Judicial District of Shiprock, New Mexico

**Steven and Rita Cummings, Plaintiffs,**
**v.**
**Verianne Yazzie, Defendant.**
**Decided February 2, 1996**

## JUDGMENT AND ORDER

Judge Lorene Ferguson presiding.

This is a personal injury case in which negligence is alleged by the Plaintiff. The matter was heard on August 04, 1995. This Court's findings are as follows:

1. Verianne Yazzie, Defendant, on the night of August 13, 1993, drove to Gallup, New Mexico with two of her sisters and the activities conducted in Gallup, New Mexico consisted primarily of drinking at the Shalimar Bar. Defendant admitted drinking at least four (4) margaritas.

2. Defendant, Verianne Yazzie, at the time was employed in Durango, Colorado. On August 13, 1993, she drove at around 4:00 am - 4:30 am to Durango. There she worked as a seamstress until at which time she and her sisters drove back to Shiprock and later on to Gallup, New Mexico. The Gallup Indian Ceremonial event was occuring.

3. During this time, Defendant did not get any sleep.

4. After dropping off her sisters at a Gallup motel after the bar closed, Defendant began the drive back to Shiprock.

5. At around 4:30 am on August 14, close to 24 hours after her start on August 13, she realized she was falling asleep at the wheel of a Nissan pickup truck. At this time, she was nearing the site of impact.

6. The Plaintiffs, Steven and Rita Cummings, having had breakfast in Cortez, began their travel to Texas. Rita Cummings was driving an eighteen wheel trailer rig heading south also nearing milepost 76 on US Highway 666.

7. Steven Cummings was sleeping in the cab. There is an opening between the front driver area and the cab in which Steven Cummings slept.

8. Verianne Yazzie stated in her deposition that she kept falling asleep and despite that she continued to drive. She stated in her deposition that while in that state, her speedometer went down to 30-35 MPH and thereby denied she was driving fast. Ms. Yazzie did not appear with her attorney at the hearing.

9. The Plaintiffs' witness, Eiland, testified that he was driving a semi truck followed by the Cummings' truck. Mr. Eiland testified he was talking to Mrs. Cummings at the time he saw Defendant's vehicle veering across the center lane and he "veered" to the shoulder to avoid hitting the vehicle and he noticed the Defendant's vehicle crossing center lane.

*479*

10. The vehicle ran into the rear portion of the semi truck driven by Rita Cummings and the semi truck ran off the highway.

11. Witness Eiland stated he saw in his mirror that the Cummings' truck had left the road and was bouncing. Mr. Eiland radioed Rita Cummings and she told him she was involved in an accident.

12. Upon impact, the side of the vehicle (a compact truck) was torn off.

13. Damage to the Cummings' truck included damage to the left rear of the truck and Defendant's vehicle had plowed into Plaintiffs' rear axle.

14. Rita Cummings testified that the oncoming car was crossing the lane and before and, upon impact, she attempted to avoid hitting Defendant by veering to the side leaving the road.

15. Rita Cummings further testified upon veering the truck, she slammed into the armrest and the truck shook her "bad." She testified that Steven Cummings came flying through the opening from the sleeper cab where he was sleeping and he hit the dash board with his head.

16. The Cummings did not think they needed immediate medical treatment and they went back to Cortez to get the truck repaired.

17. Mr. Cummings testified that the truck was refrigerated and upon direct impact the truck could have exploded.

18. Mr. Eiland observed that the Cummings were "banged up pretty good" when he drove them back to the scene of the accident. Mr. Eiland had turned his truck around to check on the Cummings' truck.

19. Mr. Eiland testified that upon his arrival at the scene, Defendant was apologetic and appeared intoxicated and the Defendant had a strong odor of alcohol about her.

20. The Cummings returned to Cortez, Colorado to take care of the damaged vehicle and they left for Texas the following Monday. The Cummings attempted to drive back to Texas, but only went so far as Gallup. They returned to Texas that Monday and on Tuesday, Mrs. Cummings saw Dr. Hillard.

21. On August 23, 1993, a week after the accident, Rita Cummings sought treatment from Dr. Hillard, who upon examination prescribed muscle relaxant and he indicated he expected recovery. A followup was made on August 30 and on September 02, 1993, when Rita Cummings returned to see the doctor.

22. Steven Cummings sought treatment on August 30, 1993 and on September 02, 1993, along with his wife, Rita.

23. A total of three visits were charged to the Cummings by Dr. Hillard.

24. On or about September 14, 1993 and September 28, 1993, the Cummings sought further treatment from Dr. Swayze, Doctor of Osteopathy, and he prescribed muscle relaxers, pain medicine, Darvocet, and a course of physical therapy. Dr. Swayze treated the Cummings for three (3) months.

25. Dr. Swayze diagnosed bone spurs, arthritis, calcification and degenerative changes in Steven Cumming's back and neck which he indicates occurred prior to the accident.

26. Dr. Swayze also suggested that Steven Cummings probably would need a fusion in the cervical spine.

27. The first three weeks consisted of "passive modalities," i.e., massages, hot packs, etc., then treatments consisting of therapeutic exercises and when headache persisted, a neck tractor was used.

28. Treatment for Steven Cummings began September 28 and the total bill was $2,975.00.

29. Treatment for Rita Cummings was from September 14, 1993 to December, a total of 15 visits, and the total bill was $3,897.00.

30. Mrs. Cummings testified that she suffered stiffness and soreness and could not get around. Rita's right hip area below the waist was painful and it felt "like a hot poker was being poked into that area" as described by her.

31. Mrs. Cummings testified she went to another doctor (Dr. Swayze) after visits with Dr. Hillard, who treated her with Gel and Vibrators and pills for muscle spasm.

32. Mrs. Cummings described the pain in her back as if someone was poking at it with a hot poker and she described pain running down her right leg and she suffered pain if she sat or laid down for a long time and that walking "was out of the question."

33. After the last visit in December 1993 with Dr. Swayze, the Cummings went back to Dr. Swayze for reevaluation in 1995.

34. The Cummings also sought evaluation from Dr. Webb, a medical doctor, who had treated Rita Cummings before for prior injuries.

35. Dr. Webb found Rita Cummings' physical condition normal "with normal lordactic curve, normal range of motion, normal left and right lateral bending, and no muscle spasm."

36. Regarding Steven Cumming's fusion, Dr. Webb thought it a possibility only.

37. Both Steven and Rita Cummings have had multiple previous accidents; Rita Cummings having had several prior neck and back injuries.

38. Part of Rita Cummings' job was to drive a truck and to unload and her ability to unload created an expense.

39. There are some discrepancies in diagnosis regarding Mr. Cummings as follows:

a. Dr. Hillard saw Mr. Cummings on August 30, 1993 and he prescribed muscle relaxants and on a follow up visit on September 02, Dr. Hillard stated that there was less muscle spasm and non-steroidal, anti-inflammatory drugs were prescribed for what appeared to be acute cervical strain and Mr. Cummings was instructed to come back if pain persisted. Mr. Cummings did not return. Dr. Hillard expected Mr. Cummings to improve and expected full recovery.

b. Mr. Cummings sought treatment from Dr. Swayze on September 14, 1993. In addition to muscle spasm, he described a grinding sensation of the neck upon movement. Dr. Swayze x-rayed Mr. Cummings - finding narrow disk space

between two (2) vertebrae, indicating injury. For the first three weeks Dr. Swayze prescribed passive modalities. Upon the passing of several weeks, therapeutic excess were initiated, and upon persistence of headache, Dr. Swayze prescribed a neck traction "stretching at the ligament and muscles." Also, an electronic pain blocker was applied and a cervical MRI revealed, according to Dr. Swayze, a herniated disk in the neck at level C3 and C4, and "an arthritic spur existed indicating a preexisting problem at C4-C5 level, where there was a broad-based bulging disk and a spur, which was calcified. The MRI, according to Dr. Swayze, also revealed a herniated disk at C6 and C7, at the bottom of the neck. Dr. Swayze thought such condition was consistent with the accident described by the patient. Dr. Swayze testifed that Mr. Cummings might need surgery (fusion) if there were additional trauma pushing against the spinal cord.

Dr. Swayze testified that patients with herniated disk are more vulnerable to additional injury which may result in a need for surgery.

Dr. Swayze estimated the cost of surgery between $40,000-$60,000.

c. Dr. Webb, a medical doctor, first saw Mr. Cummings on April 08, 1994. At that time, Dr. Webb performed a physical examination of the cervical spine and neurological status and observed a lost of range of motion (five degrees loss of flexion and extension), and a Sperlings test and an Adson's test were also performed for possible herniated disk and thoracic outlet problems and he found them all normal.

Dr. Webb noted in a herniated disk, upon compression of the skull, the forces are transmitted through the neck making the disk bulge more and if it impinges a nerve root, the patient's symptom(s) is aggravated. Dr. Webb, upon performing the Sperling test, found it normal as it did not exacerbate any of the symptoms. The Adson test in which the patient rotates his head, which also aggrevates problem, resulted negatively in Steven Cummings' situation. Dr. Webb indicated he reviewed the MRI scan and observed abnormal disk at C6-7 level and other degenerative changes at other levels. Dr. Webb could not say when the herniated disk in level C6 and 7 occurred. Dr. Webb also indicated, when asked about Mr. Curnmings fusion, that Mr. Cummings may never require surgery, but it is a possibility. Dr. Webb would not say the herniated disk was caused by the accident on August 14, 1993.

As to other tests performed on Mr. Cummings, Dr. Webb indicated they were perfectly normal. On July 17, 1995, Dr. Webb again gave deposition and further explained that the degenerate changes in the neck and the hermated disk are a course of a degenerating disk and could be preexisting and that there is a pretty good chance of not requiring surgery.

40. Three doctors examined Rita Cummings as follows:

a. Plaintiff, Rita Cummings, saw Dr. Hillard on August 23, 1993 regarding the accident, the subject of suit here. The Plaintiff complained of left shoulder, back and neck pain. Upon a physical examination, Dr. Hillard indicated muscle spasm, but no x-rays were taken. Rita Cummings was placed on a non-

steroidal, anti-inflammatory drug. Dr. Hillard recommended that treatment consist of walks. This was also in conjunction with Ms. Cummings treatment for weight loss, treatment Ms. Cummings sought prior to her August 14, 1991 accident. Dr. Hillard saw Ms. Cummings again on August 30, 1993 along with her husband. At that time, Ms. Cummings indicated low back pain, sleeping difficulty, and tenderness along the lumbosacval joint. On September 2, 1993, Ms. Cummings returned indicating pain worsened in lower lumbar area. Dr. Hillard did not note any muscle spasm. Ms. Cummings was diagnosed as having back and cervical strain and Dr. Hillard expected her to improve.

b. On September 14, 1993, Rita Cummings consulted with Dr. Swayze and he indicated that Ms. Cummings complained of low back pain and Dr. Swayze found muscle spasm in the neck and the levator scapula muscle. Range of motion deficits were indicated. Dr. Swayze also conducted the Bragard test which was positive indicating pain in lower back. X-rays were also conducted.

Dr. Swayze indicated that he thought there was disk injury as well as low back strain, an indication that there was a bulging or herniated disk and a curve of patient's neck totally reversed from normal configuration. He also indicated a narrow disk space at L5-S1 interspace, indicating possible injury at lower back. Dr. Swayze ruled out the possibility of disk injury in the low back. The treatment applied by Dr. Swayze consisted of medication, low back support, and physical therapy, which ended December 20, 1993 at which time she was released from care.

On October 05, 1993, Ms. Cummings indicated pain and there appeared to be gradual improvement, but headaches remained severe. Dr. Swayze stated there were neck injuries and a traction was applied to the lower back. Ms. Cummings still required pain medication on October 18, 1993.

On December 18, 1993, Ms. Cummings was still having headaches and pain in the lower back.

Dr. Swayze indicated he diagnosed fibromyalgia syndrome - a permanent muscle injury which will never go away and that with time, it will worsen. Dr. Swayze indicated that bones will demineralize and Ms. Cummings will be more prone to additional injuries, including osteoporosis. Dr. Swayze also indicated that Rita Cummings may suffer muscle spasm, tension headaches and lower back pain and her ability to lift 30/40 pounds will be limited, These problems would require muscal relaxers, pain medication and physical therapy, and Dr. Swayze estimated the cost of treatment would be about $5,000.00. Dr. Swayze saw Ms. Cummings last on December 20, 1993 and the Cummings did not come back to see him nor did they request medication or physical therapy. Dr. Swayze indicated he thought it was due to the Cummings being on the road all the time and Dr. Swayze indicated it was difficult for them to make appointments.

c. Dr. Webb, an orthopedic surgeon, saw Rita Cummings on April 08, 1994 regarding neck and left shoulder pains. Dr. Webb conducted a physical examination, finding tenderness in the neck and the lower back, motion in neck

normal, and loss of flexion and extension in lower back, considered mild. No muscle spasm existed. In the area of rib cage, there existed an increased curvature which Dr. Webb thought might be genetic or secondary to osteoporosis and that she could have had an injury compression fracture. More likely, she was built that way (genetic).

## NEGLIGENCE

In a recent case, *Castillo v. Charlie*, 7 Nav. R. 181, 182 (1995), the Supreme Court of the Navajo Nation stated "Under Navajo Law, the plaintiff must prove that the defendant owed the plaintiff a duty, that the defendant breached that duty, and proximately caused injury to the plaintiff." This is basically a recital of the law of negligence.

Here, this Court is satisfied, given the facts, that the Defendant owed a duty to the Plaintiff to properly operate a vehicle on US highway 666, a route considered highly dangerous. The Court is satisfied that that duty was breached when Defendant decided to drive back to Shiprock on US highway 666 after 2:00 a.m., August 14, 1993, after having consumed alcohol (at least four margaritas) and not having slept for 24 hours, and that upon a collision due to Defendant's crossing the lane onto an oncoming semi-truck directly, Defendant proximately caused Plaintiffs to run off the road causing injury to both Plaintiffs and that damages resulted. This Court finds Defendant liable.

## DAMAGES

Damages fall into two categories: lost income and damages thrust upon him which Plaintiff would not have otherwise been subjected to such as medical expenses, pain and suffering. 22 Am. Jur. 2d, *Damages*, Sec. 86. Four areas to be considered are recovery for lost time, decrease in future earning capacity, medical services and pain and suffering.

Here, the Plaintiffs are requesting damages for medical expenses, wage loss, future medical expenses, cost of unloading and lost income.

Plaintiffs are asking for damages as follows:

|  | Rita Cummings | Stephen Cummings |
| --- | --- | --- |
| Medical expenses | $5,068.00 | $5,168.00 |
| Wage loss | $2,500.00 | $2,500.00 |
| Future Medical Expenses | $5,000.00 | $55,000.00 |
| Cost of Unloading | $2,600,00 | $2,600.00 |
| Lost income | $198,000.00 | $198,000.00 |
|  | $213,168.00 | $263,268.00 |

Compensation is the stated goal of a Court when measuring damages for personal injuries. 22 Am. Jur. 2d, *Damages*, Sec. 85. Recovery in a personal injury action may be had for all the natural and proximate consequences of the

Defendant's wrongful act or omission, such as pain and suffering, including future pain and suffering, the reasonable value of loss of time and earning capacity, including in proper cases, loss of profits, ill health or disability naturally resulting from the wrong or injury, subsequent aggravation of the injury proximately traceable to the original wrong and any other damage that can reasonably be said to have followed as the proxmiate consequence of the injury received, even though the particular form or nature of the results were not contemplated or foreseen.

The damages allowed in personal injury cases should not, however, include any compensation for injuries which are not a proximate result of the Defendant's wrongful act, but as a remote or extraordinary consequence thereof. *Id.* The amount of damages allowed for bodily injuries must, however, be fair and reasonable, free from sentimental or fanciful standards, and based upon facts disclosed. *Id.* at Sec. 86.

### 01. Medical Expenses

Rita Cummings consulted with three doctors for her injuries and she was charged a total of $5,068.00. This Court must determine whether these expenses were reasonable and necessary according to testimony, given the collision and impact. One of the important elements in finding liability is whether the injury complained of was the proximate cause of the auto accident.

Plaintiff Rita Cummings submitted medical bills in the amount of $5,068.00. This Court is satisfied the evidence and testimony presented at trial regarding the $150.00 paid to Dr. Hillard was reasonable and necessary given the accident and facts surrounding the accident. The Court also finds that the expenses relating to Dr. Swayze's treatment as well as the MRI scan and examination conducted by Dr. Webb were reasonable and necessary. While there may be some questions regarding whether the pain experienced by Rita Cummings was due to preexisting conditions, this Court finds that the accident could have very well aggravated the conditions, therefore examinations, therapy, and scan are considered reasonable and necessary. Likewise, in Steven Cummings case, this Court finds the expense of $5,168.00 to be reasonable and necessary given the facts, the testimony and evidence, and any preexisting condition would be aggravated including pain experienced by the Plaintiffs that resulted in seeking medical attention, such as the ones sought.

### 02. Wage Loss

The value of lost time must be proven with reasonable certainty so award is not made on mere speculation. *Id.* at Sec. 91. Where the Plaintiff was employed at the time of injury, earnings either immediately prior to the injury or in an appropriate case, averaged over recent years, is evidence of the value of lost time. The Plaintiff must establish a reasonable probability that his injury did bring about a loss of time, must afford a basis for a reasonable estimate of the

amount of that loss, and to this end must prove both the amount of the time lost and its value. The Plaintiff's gross wage is to be considered. *Id.*

As to wage loss for Rita Cummings, documents were submitted by Rita Cummings that she was out of work from September 11 to September 17 and Mrs. Cummings testified that both make about $5,000.00 a week, each carrying $2,500.00 gross. There was no testimony or evidence to show the wage loss to be $2,500.00 each for the week of September 11 to September 17. No testimony was given regarding a reasonable average. No testimony was given regarding when the Cummings had to cancel a scheduled trip and the loss of amount they would have earned on the trip. Rita Cummings herself testified that different trucking jobs pay different amounts. The Statement submitted by the Plaintiffs, Exhibit C, is filled out on January 18, 1994 and it does not indicate when the Cummings missed work. It has indicated two runs were missed because of *doctor appointments*. Likewise, the document submitted is not the original and the reliability of the information on the xeroxed sheet is questionable to this Court.

Based upon documents and testimony, this Court shall grant a total of $1,300.00 for lost wages for the week of September 11 to September 17 for Rita Cummings. This Court will also allow Mr. Cummings the same amount.

### 03. Cost of Unloading

Both Plaintiffs discussed their inability to unload the trucks upon delivery and they both claimed that they required extra hands to unload, each submitting costs of unloading at $2,600.00 each. However, neither submitted documents of receipts, payments, etc. of expenditures made, nor were witnesses brought to testify to support their claims. There was no evidence regarding the time the help was hired, nor was evidence submitted regarding whether the amount submitted was reasonable.

> To authorize recovery of more than nominal damages in an action in fact, facts must exist which afford a basis for measuring the Plaintiff's loss with reasonable certainty and the evidence must be such that the jury may find the amount of the loss by reasonable inferences from established facts, and not by conjecture, speculation, or surmise. The evidence must afford data, facts, and circumstances reasonably certain, from which the jury may find the actual loss, and the Plaintiff must by a preponderance of the evidence, show that the damages which he seeks were caused by the wrongful act complained of, and show the extent and amount of such damages. *Damages*, 22 Am. Jur. 2d. Sec. 296.

Based upon this, this Court does not find sufficent evidence to award the cost of unloading.

### 04. Future Medical Expenses

Steven Cummings submitted the figure of $55,000.00 for future medical

expenses based upon Dr. Swayze's deposition that Mr. Cummings may need surgery (fusion) which he stated cost anywhere between $40,000.00 to $60,000.00. Dr. Swayze believes that Mr. Cummings may eventually require surgery based upon his finding of a herniated disk at C6 and C7. Dr. Swayze stated this was obviously related to the accident.

Three Doctors examined Mr. Cummings. Only one thought there was a possibility that surgery may be needed. The first doctor, Dr. Hillard, upon examining Mr. Cummings believed there was going to be complete recovery by Mr. Cummings. Dr. Webb, who reviewed the MRI scan in April 1994, was aware of the herniated disk at C6 and C7 and he could not say whether this was caused by the accident. Upon questioning by counsel about Dr. Swayze's initial prognosis regarding fusion, Dr. Webb stated he did not feel Mr. Cummings to be a surgical candidate at the time of examination and that he may never require surgery in the future and that it is a possibility.

First of all, this Court is not convinced that the herniated disk at level C6 and C7 was caused by the accident. Dr. Swayze, who is recommending a fusion, is the only one who says that the herniated disk is obviously caused by the accident. Dr. Webb stated the herniated disk is present but will not say it was caused by the accident. Thus, there is a causation problem. Secondly, even if the herniated disk was caused by the accident, the fusion is not certain. The mere statement of Dr. Swayze, without showing this Court that surgery is certain and some more ascertainable estimates as to cost and what is to be done, throws the matter into the area of speculation. Other than reference to possible surgery and a ballpark figure of cost of the surgery by Dr. Swayze, Dr. Swayze or no other physician offered testimony on these points.

> It must be clear before an allowance for the cost of future medical care can be made, there must be evidence sufficient to support a finding that any such care will be necessitated by the injury forming the basis of the action, *Damages*, 22 Am. Jur. 2d Sec. 300.

Here, it is questionable that fusion is necessitated by the injury.

Rita Cummings submitted a figure of $5,000.00 for future medical expense. This was based upon Dr. Swayze's deposition that Rita Cummings had a "diagnosis of chronic post traumatic fibromyalgia syndrome" which is a genetically predisposed condition, which Dr. Swayze believed can be triggered by trauma. Stated Dr. Swayze, "once a person is traumatized who has these genes in their makeup by heredity, then they will have post-traumatic fibromyalgia syndrome the rest of their life." Deposition at 32. When asked if her continuing to drive a semi truck will affect her future, Dr. Swayze responded,

> It's certainly going to aggravate her condition of fibromyalgia. She's going to get very stiff sitting there driving that truck, and it will, in all reasonable medical probability, exacerbate her symptons, make them worse, make her life more miserable. She certainly won't enjoy her free time when she's not driv-

ing because of the pain that it will generate. *Id.*

Dr. Swayze further stated, at pgs. 33 and 34 of the Deposition, that:

> Patients who endure chronic pain are almost always patients who become depressed. Then their bones demineralize and they become more prone to additional injuries because of thinning out of their bones, which is known as osteoporosis.... It will be difficult for her to do any work that involves prolonged flexion of her neck downwards or rise of the arms out in front, and use of the arms up above the head. Or putting the neck in any cramped position will result in muscle spasm and headaches. And if she does any lifting to any degree over 30 or 40 pounds, probably her bulging disk syndrome will cause low back pain, which she continues to have as of her last visit.

Dr. Swayze indicated the annual cost of treatment and medication for the condition could be $5,000.00: "it could amount to as much as $5,000.00 in the future, maybe more." No other witness or other figures are introduced to support this. Dr. Swayze determined Rita Cummings to be affected by chronic post traumatic fibromyalgia syndrome indicative by "pressure points." Dr. Swayze indicated fibromyalgia is a disk injury which often times is permanent and 30% of the population is predisposed to this condition genetically. Dr. Swayze referred to this condition discovered by a Dr. Pelligrino, a Physical Therapist, who researched the syndrome. This Court, without testimony by Dr. Pellegrino or an expert in this field, will not consider this, but it warrants mention in that first this Court is not satisfied there is proof that such a condition exists. Secondly if it did, this Court is not satisfied that Ms. Cummings is affected as described by Dr. Swayze. Finally, Dr. Swayze indicated very briefly, without further proof, that future medical expenses involving this condition may be $5,000.00 or more.

### 05. Lost Income

As a condition to recovery for loss of earning capacity, the person harmed must offer evidence, convincing to the trier of fact, that a significant amount of earnings have been lost, or that his earning capacity has been significantly harmed. To do this, he must introduce evidence of the amount of earnings received prior to the time of injury or the amount that he was capable of obtaining, and at least some evidence having a tendency to show that he could have earned something during the period in which loss of earnings is claimed.

Here, Ms. Cummings testified that they gross $5,200.00 a month and out of that full personal expenses, insurance, etc. are deducted and she figured they make $1,100.00 a month. Briefs submitted regarding lost income listed $198,000,00 as projected lost income This is based upon $550.00 per month for 30 years. Ms. Cummings is presently about 53 years old and these figures expect her to continue work until age 83. Steven Cummings' lost income is also projected at $198,000.00. These figures are submitted as total of income. Dr. Swayze stated in his deposition that Cummings stopped coming in for treatment

on December 20, 1993, as he thought they were on the road all the time and it was difficult for them to keep appointments. Based on this deposition, this Court is not convinced (and based upon the evidence presented) that the Cummings will have lost income in the future or any loss of earning capacity.

### 06. Punitive Damages

Punitive damages are allowed to punish the Defendant and serve as a warning and example to deter him and others from committing like offenses in the future. 22 Am. Jur. 2d *Damages* Sec. 236.

Here, the Plaintiffs have requested punitive damages, alleging that Defendant was in wanton disregard or reckless of the rights and safety of others.

The Defendant had not slept in twenty-four hours, had at least four margaritas and attempted to drive back to Shiprock in the early morning hours on US highway 666, one of the more dangerous roads in the state. While there may not be heavy traffic between 2:00-5:00 a.m., there are people who travel on the road, some of whom are semi-truck drivers, as is the case here.

This Court, based upon the facts given in the case, finds Defendant in wanton and reckless disregard of rights and safety of others, particularly the Plaintiffs on US highway 666 in the early morning hours of August 14, 1993.

## JUDGMENT

This Court hereby enters Judgment that (given the findings of facts by this Court) Verianne Yazzie is found negligent in her conduct and in the operation of her vehicle on the early morning hours of August 14, 1993, which was the proximate cause of the collision and injury to Rita and Steven Cummings.

The Court enters Judgment for damages as follows: For Rita Cummings, $5,068.00 for medical expense incurred, $1,300.00 for lost time, $3000.00 for punitive damages, -0- for future medical expenses, -0- for unloading cost and -0- for loss income. The Total for Rita Cummings is $9,368.00

For Steven Cummings, this Court enters Judgment for $5,168.00 medical expenses incurred, $1,300.00 for lost time, $3,000.00 for punitive damages and -0- for future medical expense, -0- for unloading cost and -0- for loss income. The total for Steven Cummings is $9,468.00.

Finally, Verianne Yazzie did not appear on her court date. This Court allowed her the following day to appear and she failed to appear. This Court thereby finds her in contempt and thereby ORDERS Verianne Yazzie to pay cost of $1,550.58 as requested by the Plaintiffs, and attorney's fees in the amount of $1,000.00 for Plaintiffs' attorney. The total amount is $21,386.68, which is to be paid to the Plaintiffs as specified.