FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMIEN RAE JENSEN, individually and as parent and next friend of minor D.J. and as Personal Representative of the Wrongful Death Estate of unborn child C.J.; CHAVIS JOHNSON, individually and as Personal Representative of the Wrongful Death Estate of Butch Corey Johnson; MARGARET JOHNSON; FRANK JOHNSON; FRANCESCA JOHNSON; JUSTIN JOHNSON; HOLLY JOHNSON; DOMINIQUE JOHNSON; RAYMOND JENSEN, Sr.; LOUISE R. JENSEN; KATRINA JENSEN; RAYMOND JENSEN, Jr.; MURPHY JENSEN; NICOLE JENSEN; RYAN JENSEN; JUSTIN JENSEN, | No. 20-15908 <br><br> D.C. No. 3:15-cv-08019-SPL <br><br><br> OPINION |

*Plaintiffs-Appellants,*

v.

EXC, INC., DBA D.I.A. Express, Inc., DBA Express Charters, a Nevada corporation; CONLON GARAGE, INC., a Colorado

corporation; GO AHEAD
VACATIONS, INC., a Massachusetts
corporation; RUSSELL J. CONLON,
individually; NATIONAL
INTERSTATE INSURANCE CO.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the District of Arizona
Steven P. Logan, District Judge, Presiding

Argued and Submitted May 11, 2021
San Francisco, California

Filed September 22, 2023

Before: WALLACE and COLLINS, Circuit Judges, and
RAKOFF,[*] District Judge.

Opinion by Judge Collins;
Partial Concurrence and Partial Dissent by Judge Wallace

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

# SUMMARY[**]

## Evidence / Arizona and Tribal Law / Negligence

In a diversity action involving personal injury and wrongful death claims arising from a collision between a sedan and a tour bus on a U.S. highway within the boundaries of the Navajo Nation reservation, the panel affirmed the district court's judgment in favor of defendants to the extent that it dismissed all claims that had been asserted solely under Navajo law; reversed the district court's judgment on the claims that were submitted for trial because the district court erroneously allowed the introduction of hearsay opinions of a non-testifying putative expert; and remanded for a new trial.

The panel held that the district court abused its discretion in allowing, under the guise of impeachment evidence against plaintiffs' expert witnesses, defendants' counsel to elicit the opinions expressed in a police report prepared by the Arizona Department of Public Safety as to the cause of the accident. An opinion rendered by a person of unknown qualifications and contained in a report that, without any other explanation, relies uncritically on the hearsay statements of only selected witnesses and that does not expressly take account of, or address, any other relevant considerations, does not bear sufficient indicia of reliability and trustworthiness to be admitted as a competing expert "opinion" that a testifying expert may be required to address

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

on cross-examination.  The panel held that the error was not harmless, and reversed and remanded for a new trial.

Next, the panel affirmed the district court's conclusion that Arizona law applied and its resulting dismissal of all claims that were asserted only under Navajo law.  In determining what law governed the case, the panel applied Arizona substantive law.  Arizona courts generally follow the Second Restatement of Conflict of Laws in determining the applicable law in a tort case.  Applying the relevant factors set forth in the Restatement, the panel agreed with the district court that Arizona law applied rather than Navajo law.

Finally, plaintiffs challenged the district court's refusal to hold that, as a matter of law, defendant Russell Conlon's negligence proximately caused the accident.  As a threshold issue, the panel held that it could not review the district court's denial of summary judgment on the causation issue where an actual trial has intervened between the summary judgment ruling and the final judgment on appeal.  The panel was limited to reviewing only the denial of plaintiffs' comparable arguments in its Fed. R. Civ. P. 50 motions for judgment as a matter of law at trial.  The panel held that the district court properly denied plaintiffs' motions for judgment as a matter of law because, under Arizona law, a reasonable jury could find that Conlon's negligence was not the proximate cause of the accident.

Concurring in part and dissenting in part, Judge Wallace would affirm the district court in all respects.  He concurred with the majority that Arizona state law governed this action and that the district court did not err in denying plaintiffs' motion for judgment as a matter of law.  He dissented from the majority's resolution of the evidentiary question, and he

would hold that the district court did not abuse its discretion in permitting defendants' counsel to ask the plaintiffs' experts about the police officer's report and conclusions because the report was sufficiently reliable to be considered and to be the subject of limited cross-examination.

## COUNSEL

Geoffrey R. Romero (argued), Law Offices of Geoffrey R. Romero, Albuquerque, New Mexico; John P. Lavelle, University of New Mexico, Albuquerque, New Mexico; Thomas A. Biscup, Zebrowski Law, Shelby Township, Michigan; for Plaintiffs-Appellants.

Eileen D. GilBride (argued), John T. Masterson, Elizabeth A. Gilbert, and Brandi C. Blair, Jones Skelton & Hochuli PLC, Phoenix, Arizona, for Defendants-Appellees.

## OPINION

COLLINS, Circuit Judge:

This diversity suit involves personal injury and wrongful death claims arising from a collision between a sedan and a tour bus on a U.S. highway within the boundaries of the Navajo Nation reservation. Before trial, the district court held that Arizona law applies to the accident, and it therefore dismissed all claims based on Navajo law. At trial, the jury rejected all remaining claims asserted by the sedan's surviving passengers and by the estate of the sedan's driver, and the district court entered judgment in favor of the tour bus driver, the tour organizer, and other related corporations.

We affirm the dismissal of all claims that were based on Navajo law.  However, we conclude that the district court erroneously permitted defense counsel to introduce, and to rely upon at trial, the hearsay opinions of a non-testifying putative expert, namely, the state trooper who investigated the crash and who expressed an opinion as to how it occurred.  We therefore affirm in part, reverse in part, and remand for a new trial.

# I

## A

On the night of September 20, 2004, a group of tourists participating in a National Parks tour organized by Go Ahead Vacations, Inc. ("Go Ahead Vacations") stayed at a Hampton Inn on Highway 160 in Kayenta, Arizona, within the Navajo reservation.  Go Ahead Vacations had chartered a bus for the tour from EXC, Inc. ("EXC"), which provided a 2004 Van Hool 57-seat motor coach driven by Russell Conlon.  At around 8:00 AM on the morning of September 21, Conlon, together with a tour guide and 38 passengers, boarded the bus to head out to the Grand Canyon.  The Hampton Inn from which they departed is located on the north side of U.S. Highway 160, which is an east-west road that "is open to the public and maintained by the State of Arizona under a federally granted right-of-way over Navajo Nation land."  *EXC Inc. v. Jensen*, 2012 WL 3264526, at *1 (D. Ariz. Aug. 9, 2012), *aff'd*, 588 F. App'x 720 (9th Cir. 2014), *cert. denied*, 579 U.S. 941 (2016).  Driving the tour bus, Conlon turned to the right out of the Hampton Inn's driveway, and the bus began heading westbound on Highway 160.

At the point at which the tour bus entered Highway 160 in front of the Hampton Inn, the highway has two westbound

travel lanes.  However, shortly down the road to the west, those two lanes merge into one.  Just before he turned westbound onto Highway 160, Conlon looked to the east and saw a Chevy Tahoe (driven by Bert Wisner) turn out of a nearby Burger King into the left-most westbound lane of Highway 160.  Despite seeing the Tahoe turn into the left-most lane, Conlon turned onto the highway and then proceeded to move into that very same left-most lane *before* the Tahoe had passed the bus.  Presumably annoyed that the slow-moving 40,000-lb. bus had turned directly in front of him in the left lane rather than stay in the right lane, Wisner moved his vehicle into the right lane and began catching up to the bus.

At the same time, a Pontiac Sunfire sedan driven by Butch Corey Johnson was proceeding eastbound on Highway 160.  In the front passenger seat of the sedan was his wife, Jamien Rae Jensen, who was holding their one-year-old son D.J. and who was also pregnant with their unborn second child.  The front left of Johnson's sedan collided with the front left of the tour bus.  Johnson died as a result of the crash, Jensen and their son D.J. suffered injuries, and Jensen's unborn child was killed.  At the time of the collision, Wisner's Tahoe was next to the bus.  Both vehicles veered to the right, following roughly parallel paths until they came to rest off the north side of the westbound highway, about 20 to 25 feet apart from each other.

At the time of the accident, Highway 160 had just been resurfaced and the lanes were marked with temporary yellow tabs instead of painted lines.  The parties agree that the accident occurred in the vicinity of the left-most westbound lane, but they disagree about most other major points about exactly what happened.  Plaintiffs' theory at trial was that Johnson was driving in the lane immediately to the south of

the left-most westbound lane (which was either a center, universal turn lane or was the left-most eastbound lane); that Conlon, distracted by Wisner's nearby vehicle, entered Johnson's lane; and that Conlon veered to the right shortly before the impact. Defendants' theory was that Johnson crossed into the westbound lanes and collided with the bus.

**B**

The ensuing tort litigation was first filed in the courts of the Navajo Nation in 2006, but we ultimately held in December 2014 that the tribal court lacked jurisdiction. *See EXC, Inc.*, 588 F. App'x at 722. Two months later, this lawsuit was filed in federal court by Jensen, suing individually and on behalf of D.J., and by Johnson's brother Chavis Johnson, as the representative of Johnson's wrongful death estate (collectively, "Plaintiffs"). Named as Defendants were Conlon, EXC, Go Ahead Vacations, and another corporation related to Conlon (collectively, "Defendants"). Asserting that Navajo law applied and permitted additional persons to sue for damages arising from Johnson's death, the original complaint named, as additional plaintiffs, the wrongful death estate of Jensen's unborn child and several additional family members other than Jensen and D.J. The complaint also asserted, based on Navajo law, direct claims against EXC's insurer. However, the district court subsequently granted Defendants' motion for judgment on the pleadings and held that Arizona law, not Navajo law, governed this case. Accordingly, the court held that "Plaintiffs and Defendants that have been made party to this suit pursuant only to Navajo and customary law are dismissed with prejudice."

Plaintiffs then filed their operative First Amended Complaint. That complaint asserted two causes of action:

(1) a claim for personal injuries and related damages caused by negligence, negligence per se, and aggravated negligence; and (2) a claim, based on similar alternative theories of negligence, for wrongful death. The case ultimately proceeded to a jury trial. After the district court denied Plaintiffs' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), the case was submitted to the jury, which rendered a special verdict finding that Defendants were not at fault for the death of Johnson or for the injuries to Jensen and D.J. The clerk entered judgment on the jury verdict for Defendants in December 2019, and Plaintiffs thereafter filed a timely renewed motion for judgment as a matter of law under Rule 50(b). The district court denied that motion in April 2020, and Plaintiffs timely appealed. *See* FED. R. APP. P. 4(a)(4)(A)(i).

## II

Plaintiffs argue that the district court erred in allowing, under the guise of impeachment evidence against Plaintiffs' expert witnesses, the introduction of inadmissible evidence from a police report prepared by the Arizona Department of Public Safety ("ADPS" or "DPS"). We review a district court's admission of evidence, including purported impeachment evidence, for abuse of discretion. *See*, *e.g.*, *United States v. Osazuwa*, 564 F.3d 1169, 1173 (9th Cir. 2009). We conclude that the district court abused its discretion and that the error was not harmless. Therefore, we remand for a new trial.

## A

Prior to trial, Plaintiffs filed a motion *in limine* concerning the accident reports that had been prepared by the ADPS and by the Kayenta Police Department. In their

motion, Plaintiffs conceded that the portions of the police reports that contained "personal knowledge, photos, and measurements taken by the investigating officers" were admissible under Federal Rule of Evidence 803(8)(A)'s hearsay exception for public records.  But to the extent that the reports contained "discussions, opinions, and conclusions about what allegedly happened based on interviews and other inadmissible sources," Plaintiffs contended that the reports were inadmissible hearsay under Rule 802 and also that they were unduly prejudicial under Rule 403.  Therefore, Plaintiffs requested that the district court exclude "any evidence, testimony, reference, or argument related to investigation of the accident, including any conclusions or opinions, that are not based solely on personal knowledge and measurements."  In their response to this motion, Defendants stated that they did "not object to . . . preclusion of hearsay contained within police reports, coroner's reports, and medical records that are not subject to a hearsay exception."  The district court granted Plaintiffs' motion *in limine*.  In doing so, the court agreed that Defendants could still "introduce statements in the police reports that are made by the officer and based on personal knowledge and observation," but the court cautioned that, before seeking to introduce any such statements, Defendants should first request a "sidebar" to "raise the issue with the Court."

On the second day of trial, Plaintiffs called Robert Turner, whom the district court found to be qualified to testify as an expert "in commercial vehicle code enforcement and training."  During his brief direct examination, Turner testified that, by moving into the left-most westbound lane of Highway 160 when he exited the Hampton Inn parking lot, Conlon had violated Arizona Revised Statutes § 28-721,

which he said generally required the bus to stay in the right-most lane.  *See* ARIZ. REV. STAT. § 28-721 (2004 ed.).[1]  On cross-examination, Turner further opined that Conlon "should have waited until the Tahoe had passed" before turning into the highway and that, in his view, the "main cause" of the accident "was the fact that the bus" moved "out of its lane" and "was to the left of the lane."  Defense counsel elicited from Turner that he had reviewed the ADPS report about the accident, and counsel then asked if "that was one of the materials or documents [Turner] relied upon in preparing [his] opinions as an expert witness."  Turner responded, "It all contributed.  I read it all and evaluated it."  Turner also confirmed that it would be "customary" and "reasonable" for an expert in his field to review such reports.

Defense counsel then asked for a sidebar, which the court allowed.  Counsel stated that he "want[ed] to be careful because of a motion in limine," and he explained that he was "intending to ask the witness about information he reviewed in the Arizona Department of Public Safety report that includes witness statements, statements from the driver, and actual information provided by the DPS officer in that report that this witness just testified he relied upon in preparing his opinions."  Defense counsel argued that he should be allowed to ask about those items to show "bias of this witness, because what he's doing is he's disregarding every single witness and every single finding other than" the findings of another of Plaintiffs' experts (Gabriel Alexander).  Defense counsel specifically stated that he wanted to ask Turner about the ADPS report's conclusion "that there was no improper driving by the bus."  Plaintiffs' counsel objected, stating that only the officers' own "measurements" and observations should be admitted and

---

[1] The text of that statute is quoted and discussed below.  *See infra* note 9.

not the "ultimate conclusions by the officers." Plaintiffs' counsel also objected that the "opinion by the officer is not expert testimony opinion." Defense counsel responded by arguing that it is proper to ask an expert witness about what he "read and relied upon in preparing his opinions." The court ruled that, because it had "agreed that [Turner] should be considered as an expert," it would allow "that limited question."

Defense counsel then engaged in the following questioning:

> Q. When you read the Arizona Department of Public Safety report, you noted in the report that vehicle number one—excuse me, sir—or traffic unit number one is the white car driven by Butch Johnson. Do you recall that?
>
> A. I remember, yes.
>
> Q. And traffic unit two or vehicle number two is the bus, right?
>
> A. Yes.
>
> Q. And as you recall that the Department of Public Safety police report indicated that with respect to vehicle number two, the bus, there was no improper action, right?
>
> A. I vaguely remember that.
>
> Q. Okay.
>
> A. It's been awhile since I reviewed that report.
>
> Q. And in the DPS report, the DPS officer who investigated the accident who was

actually out at the scene of the accident, investigated the accident, took the measurements, talked to all the witnesses, also determined that the car driven by Mr. Johnson was traveling at a speed too fast for conditions, correct?

A. That may have been in the report, yes.

Q. And the Department of Public Safety police report shows that vehicle number one, the car driven by Mr. Johnson, engaged in unsafe passing?

A. In unsafe passing?

Q. Yes, sir.

A. Like I say, it's been awhile since I read the report, so—

Q. Would you disagree with me if I tell you it says that?

A. I'd have to look at it.

Q. Well, you do agree that the report says there was no improper action by the bus, right?

A. I remember some of that, yes.

Q. And you do agree with me that the DPS report states that the car driven by Mr. Johnson was traveling at a speed too fast for conditions, right?

A. Well, if the report says that and it conflicts with the—if it conflicts—

Q. Well, ley me stop you, sir, because my question was only doesn't the report say that?

A. Does it say that? Yes.

Q. Okay. So the Arizona Department of Public Safety—And that's the Highway Patrol, right, the state police?

A. Right.

Q. They went out to the scene of the accident, investigated the accident, made measurements, took photos, correct?

A. Yes.

Q. Talked to witnesses at the scene who saw the accident, correct?

A. Yes.

Q. And they were out there the same day as the accident, right?

A. Yes.

Q. And the Arizona Department of Public Safety report says, with respect to the bus, there was no improper action, right?

A. Yes.

Q. And says the white car driven by Mr. Johnson was driving too fast?

A. Could I speak to that?

Q. Well, is the answer yes?

A. Yes.

Plaintiffs also called Gabriel Alexander, whom the district court found was qualified to testify as an expert on "accident reconstruction." On direct examination, Alexander opined that, based on the position of the bus's tire skid marks, he believed that the bus was over the line of the left-most westbound lane at the time of the accident. Alexander's view was that, because Conlon was aware that Wisner was trying to pass him on the right before the two westbound lanes merged down to one, Conlon moved leftward to allow Wisner to pass and ended up going over the line into the eastbound lane. Although the point was sharply disputed at trial, Alexander testified that he believed that the arrangement of temporary tabs marking the lanes did *not* provide for a center, universal turn lane—meaning in his view that, when Conlon assertedly crossed over the line, the bus was in the eastbound lanes rather than a center turn lane. Alexander estimated that, "[p]rior to impact, [Conlon] was about five feet" over the line. Alexander's opinion was that, in reaction to seeing the bus come over the line, Johnson then veered to his left; that Conlon simultaneously veered back to his right; and that the two vehicles then collided. Alexander also opined that Conlon must have been over the center line because, if he had instead begun moving right from the westbound lanes, he would have hit Wisner's vehicle, which would have been too close to the bus to react in time. The fact that Wisner had time to react and to stay parallel to the bus as it drove off the road on the right suggested to Alexander that the bus had been further to the left from Wisner when it first began moving over to the right.

On cross-examination, Alexander acknowledged that his expert report had not claimed that there was no center universal turn lane and that, during his deposition, he had agreed that there was such a lane. Alexander further

acknowledged that his own diagram showed that there was a center turn lane further east, in front of the Hampton Inn and the Burger King.  Alexander also admitted that, in his deposition, he had agreed that, at the time of impact, no part of Johnson's vehicle was in the eastbound lanes but was instead "completely in the universal turn lane or even partially within the westbound lane."  On redirect, Alexander noted that he had also stated during his deposition that only one side of what would have been the universal turn lane had double yellow tabs, meaning that, from Johnson's perspective, the lane would appear to be an eastbound lane.

During cross-examination, Alexander was also asked about his assumption that there had been no contact between the bus and Wisner's Tahoe.  Although the parties had formally stipulated that "[t]here was no contact between the bus and Mr. Wisner's SUV," Wisner actually testified at his deposition that the bus hit his "left-hand mirror," but no other part of his vehicle.  The relevant deposition excerpts were presented to the jury, and defense counsel asked Alexander whether Wisner's testimony was consistent with his theory.  Alexander responded that he did not "see how it could have happened" that way, and he agreed that, if Wisner said that, he was "just wrong."

At one point in the cross-examination, Defense counsel confirmed that Alexander had reviewed and relied upon the ADPS report, and counsel then engaged in the following colloquy with Alexander:

> Q. And the Arizona Department of Public Safety did investigate this accident, right?
>
> A. Yes.

Q. And a state trooper went out to the scene of the accident on the day of the accident and took photographs and measurements and talked to witnesses and prepared the report that you reviewed, right?

A. Well, I'm going to assume that.

Q. Okay. And then based upon the investigation conducted by the state trooper at the scene of the accident on the day of the accident, a report was prepared, correct?

A. That's correct.

Q. And the report and—and you reviewed the report—says that traffic unit one, Johnson, was traveling eastbound on U.S. 160 when it crossed the center line and collided into traffic unit two, correct?

A. Yes.

Q. And it also says, with respect to vehicle number two, the bus, there was no improper action, correct?

A. That's correct.

Q. And the Arizona Department of Public Safety report, the investigating officer also checked the box that indicates that vehicle number one, the Johnson car, was traveling at a speed too fast for conditions, correct?

A. That's correct.

Defense counsel subsequently mentioned the ADPS report during his closing argument. After first noting that all

of the eyewitnesses to the accident testified that Johnson drove into the bus, defense counsel stated:

> The Department of Public Safety highway patrol officer who was at the scene of the accident who investigated the accident on the same day of the accident designated the Johnson vehicle [as] vehicle number one. What does that mean?
>
> Well, Mr. Alexander told you that DPS officers will determine who they think is at fault, and they will designate that vehicle [as] vehicle number one. So the DPS officer who was at the scene of the accident that day, investigated the accident, talked to witnesses, took photographs, took measurements, made the decision that Mr. Johnson's vehicle was the at-fault vehicle, vehicle number one.
>
> And the DPS officer went further. The DPS officer who investigated the accident, who was at the scene of the accident, who took photographs, who took statements, who took measurements stated that the Johnson vehicle was traveling eastbound on U.S. 160 when it crossed the center line and collided into traffic unit number two. Traffic unit number two is the bus.
>
> And the DPS report prepared by the officer who was at the scene, who investigated the accident, who took measurements, who took photographs, who talked to witnesses and prepared a report

said, with respect to vehicle number two, the
bus, there was no improper action.

And he also noted that the Johnson
vehicle was traveling at a speed too fast for
conditions, in other words, that he was
speeding.

Defense counsel then argued that Alexander's opinion
concerning the accident was not credible because Alexander
had changed his view about whether there was a universal
turn lane and because Alexander's opinion was inconsistent
with all of the eyewitness testimony, with Wisner's
testimony about his left mirror being hit by the bus, and with
the ADPS report.

**B**

On appeal, Plaintiffs renew their objections, made in
their pretrial motion *in limine* and during the sidebar at trial,
that (1) no portion of the ADPS police report should have
been admitted other than the officers' own "measurements"
and observations; and (2) in particular, the "opinion by the
officer" concerning the accident "is not expert testimony"
and the "ultimate conclusions by the officers" should have
been excluded.  We conclude that, on this record, the district
court abused its discretion in allowing Defendants' counsel
to elicit the opinions expressed in the ADPS report as to the
cause of the accident.

As a general matter, hearsay is an out-of-court statement
offered "to prove the truth of the matter asserted in the
statement," FED. R. EVID. 801(c)(2), and it is "not
admissible" unless otherwise provided by federal statute or
rules, FED. R. EVID. 802.  Among the exceptions provided in
the Federal Rules of Evidence is the exception for public

records, which states that the rule against hearsay does not exclude a "record or statement of a public office" that "sets out . . . a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel." FED. R. EVID. 803(8)(A)(ii).[2] This public-records hearsay exception applies only if "the opponent [of admission] does not show that the source of information or other circumstances indicate a lack of trustworthiness." FED. R. EVID. 803(8)(B). We have held that, under the public-records exception, "entries in a police report which result from *the officer's own observations and knowledge* may be admitted" in a civil case. *United States v. Morales*, 720 F.3d 1194, 1202 (9th Cir. 2013) (emphasis added) (citation omitted). By contrast, any statements from third parties that are recounted in a police report involve an additional layer of hearsay that must be separately justified by another exception to the hearsay rule. *See* FED. R. EVID. 805; *see also Morales*, 720 F.3d at 1202 (stating that "the exception allowing for a 'matter observed while under a legal duty to report' in Rule 803(8) 'generally does not pave the way for official records to prove conclusions resting on statements by outsiders or to prove what such outsider statements themselves assert' unless 'the outsider's statement itself fits an exception'" (citation omitted)).

Contrary to what Plaintiffs suggest, this latter restriction against the admission, for their truth, of the contents of third-party statements recounted in police reports was not violated

---

[2] The evidence rules also contain a separate hearsay exception for business records, *see* FED. R. EVID. 803(6), but we have held that "this exception does not apply to records of government agencies, which are public records for purposes of Rule 803." *United States v. Morales*, 720 F.3d 1194, 1201 (9th Cir. 2013); *see also United States v. Orozco*, 590 F.2d 789, 793–94 (9th Cir. 1979).

in this case.  As our earlier verbatim excerpts of the relevant questioning and arguments make clear, defense counsel did *not* disclose or elicit anything about the actual substance of any witness statements recounted in the police report. Instead, he elicited that the officer at the scene took various witness statements—whose content was not disclosed—and that the officer then reached a conclusion, based on all of the information gathered (including those statements), as to how the accident occurred.  *See supra* at 12–19.

The central question, instead, is whether the district court properly admitted, in cross-examination of Plaintiffs' experts, the police report's *conclusions* as to how the accident transpired.  That question implicates, in the first instance, a different provision of the public-records exception to the hearsay rule, *viz*., a portion of Rule 803(8) that allows the admission—absent a showing of lack of trustworthiness—of a "record or statement of a public office" that sets out, "in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation."  FED. R. EVID. 803(8)(A)(iii); *see also* FED. R. EVID. 803(8)(B).  The Supreme Court has held that the "factual findings" covered by this hearsay exception include a "conclusion" or "opinion" in such a report that "is based on a factual investigation" as described in the rule and that "satisfies the Rule's trustworthiness requirement."  *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) (construing the same hearsay exception, which was then in Rule 803(8)(C)).  That construction of the rule would extend to a police report's conclusions as to the manner in which a traffic accident occurred.  *See*, *e.g.*, *Simmons v. Chicago & Nw. Transp. Co.*, 993 F.2d 1326, 1327–28 (8th Cir. 1993).

In moving *in limine* to exclude the police report, Plaintiffs argued that the report's conclusions were untrustworthy and were therefore inadmissible under Rule 803(8). In their response to the *in limine* motion, Defendants did not contest that point, and the district court granted the motion. In later seeking admission of additional portions of the report, Defendants did *not* rely on Rule 803(8), nor did they contend that Plaintiffs had failed to show "a lack of trustworthiness." FED. R. EVID. 803(8)(B). At the sidebar, after Plaintiffs' counsel reiterated that the court's *in limine* ruling had excluded the "opinion[s]" and "conclusions" of the officers as hearsay, and Defendants' counsel again did not dispute that point. Instead, Defendants' counsel's position was that his proposed line of questioning did not "really involve[] the motion in limine," because his purpose was to "show[] [the] bias" of Plaintiffs' expert by cross-examining him about "what he analyzed" and "what he disregarded." Moreover, in response to Plaintiffs' reliance, in their appellate opening brief, on caselaw construing the limitations on admission of police reports under Rule 803(6) and 803(8), Defendants' answering brief never argued that the report's conclusions were admissible under Rule 803(8)(A)(iii). We therefore deem any reliance upon Rule 803(8) to be forfeited, and we proceed on the basis that the opinions expressed in the report were hearsay that is not covered by any exception.[3]

---

[3] In any event, for the reasons discussed below, we conclude that the police report's opinion as to the cause of the accident lacked sufficient independent indicia of trustworthiness to be admissible in the absence of an adequate foundation as to the expert qualifications of the report's author and the methods and reasoning used to reach those conclusions. *See infra* at 24–32. These same considerations confirm that, had Defendants sought to rely on Rule 803(8), the district court would have abused its discretion had it invoked that rule here.

Defendants nonetheless contend that the questioning constituted permissible cross-examination under Rules 703 and 705, which address the extent to which an expert may be questioned about the bases for his or her opinion.  Rule 703 generally allows experts to rely on otherwise inadmissible evidence in formulating their opinions "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  FED. R. EVID. 703.  However, the "*proponent* of the opinion" may not disclose such otherwise-inadmissible "facts or data" to the jury unless "their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id*. (emphasis added).  By contrast, Rule 705 then broadly allows the *opposing* party, on cross-examination, to elicit any "underlying facts or data" on which the opinion was based.  FED. R. EVID. 705.  Defendants argue that, because Plaintiffs' experts both stated that they had reviewed and relied on the police report, Rule 705 allowed Defendants to cross-examine the experts about the report's contrary opinion concerning the cause of the accident.  We disagree.

In evaluating this argument, we begin with the full text of Rule 705, which states:

> Unless the court orders otherwise, an expert may state an *opinion*—and give the *reasons* for it—without first testifying to the *underlying facts or data*.  But the expert may be required to disclose those facts or data on cross-examination.

FED. R. EVID. 705 (emphasis added).  With respect to the particular expert who is being examined on the stand, Rule 705 thus distinguishes between three distinct aspects of the

expert's opinion testimony, namely: (1) the ultimate "opinion" that the expert has been found to be qualified to render in accordance with the strictures of Rule 702; (2) the "underlying facts" and "data" on which that opinion is based[4]; and (3) the "reasons" why the expert drew that "opinion" from those "underlying facts" and "data." *Id*. In appropriate cases, the "underlying facts" and "data" on which an expert's opinion is based may, in turn, include the opinion of *another* expert with respect to a subsidiary issue. *See Westfield Ins. Co. v. Harris*, 134 F.3d 608, 612 (4th Cir. 1998). And the underlying facts or data on which the opinion is based may also include facts that are "*unfavorable* to the opinion"—*i.e.*, facts that are among those considered by the expert but that, for one reason or another, were discounted in formulating the expert's opinion. *See* FED. R. EVID. 705, advis. comm. note (1972 proposed rule).

The question presented here is how these principles apply in the unique context of a testifying expert's review of a *contrary opinion* rendered by another person on the *very same* issue that is the subject of the testifying expert's opinion. Defendants' position is that, simply because Plaintiffs' experts' *read* the police report and relied on its data, that report's contrary opinion on the cause of the accident is properly deemed to be among the unfavorable "facts or data" that may be freely elicited on cross-examination of those experts under Rule 705. But, as we and other courts have acknowledged, the unique situation of

---

[4] In referencing "*the* underlying facts or data," Rule 705 clearly refers back to the "facts or data" on which the expert has "base[d]" an "opinion," as addressed in Rules 702 and 703. *See* FED. R. EVID. 702(b) (stating that, to be admissible, expert testimony must, *inter alia*, be "based on sufficient facts or data"); FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").

questioning one expert about the competing opinion of a non-testifying expert on the very same issue is one that raises special concerns that defy such a simplistic rule.

In *Phillips v. E.I. DuPont de Nemours & Co.* (*In re Hanford Nuclear Reserv. Litig.*), 534 F.3d 986 (9th Cir. 2008), we expressly "agree[d] with the Fifth Circuit that reports of other experts cannot be admitted even as impeachment evidence unless the testifying expert *based his opinion* on the hearsay in the examined report or *testified directly* from the report." *Id*. at 1012 (emphasis added) (citing *Bryan v. John Bean Div.*, 566 F.2d 541, 546–47 (5th Cir. 1978)). That principle was easily applied in *Phillips*, where (unlike in this case) the opposing counsel cross-examined an expert with opinions expressed in a document that the testifying expert had not even read. *Id*. at 1011–12 (noting that the testifying expert had "never read nor relied on [the non-testifying expert's] deposition in rendering his expert opinion"). But our express endorsement of the Fifth Circuit's decision in *Bryan* confirms that the principle applied in those cases is not so narrow.

In *Bryan*, the plaintiff, an automobile mechanic, was grievously injured when a cast-iron tool used in aligning wheels "broke into pieces under pressure." 566 F.3d at 543. He sued John Bean Corp. ("Bean"), which had designed and distributed the tool, on strict-liability theories of design defect and manufacturing defect. *Id*. at 543, 549. Bean in turn filed a third-party claim against Midland-Ross Corp. ("Midland-Ross"), which had manufactured the tool for Bean. *Id*. In rebutting the claims of manufacturing defect at trial, Midland-Ross presented testimony from an expert ("Walters"), who opined that the tool "as manufactured was sufficiently strong to sustain the stress it would have encountered in normal use in the proper manner." *Id*. at 544.

In reaching his opinion, Walters had affirmatively relied on data provided by two non-testifying metallurgical experts, one of whom had been retained by the plaintiff and the other by Bean. *Id*. Given the adversity between Midland-Ross and both Bean and the plaintiff, there were aspects of these non-testifying experts' opinions that were unfavorable to Midland-Ross, and "[o]n cross-examination of Walters, plaintiff's counsel made maximum use of the opinions expressed in the two reports." *Id*. Indeed, the plaintiff's counsel "made much greater use of the opinions than of the data underlying them." *Id*. Midland-Ross objected, arguing that "the facts recited in the reports were admissible but the opinions of the experts were not." *Id*. The district court rejected this distinction, concluding that "the opinions were admissible because they were supporting data for Walters' opinion." *Id*.

The Fifth Circuit reversed, holding that the portions of the non-testifying experts' opinions elicited by the plaintiff's counsel "were improperly admitted either as evidence of the basis of the testifying expert's opinion or as impeachment evidence." 566 F.2d at 545. The court noted that, through this cross-examination, the "opinions" of the non-testifying experts "were brought before the jury without qualifying the experts who rendered them" in accordance with the requirements of Rule 702. *Id*. at 546. As such, "[t]he jury had no way of determining whether the opinions were credible or worthy of belief." *Id.* Moreover, no hearsay exception applied, the court concluded, and the limited excerpts elicited about the non-testifying experts' opinions "lacked any independent guarantee of trustworthiness that would justify dispensing with cross-examination." *Id*. Finally, the court held that Rule 705 did not authorize bringing out these opinions on cross-examination of

Walters, because Walters had not "based his opinion on the *opinion* in the examined report," nor had he "testified directly from the report." *Id*. (emphasis added). Walters admitted that he used "empirical data contained in the reports and employed these figures to reach his own conclusions," and the court held that such data "were properly brought out under rule 705." *Id*. But the competing "*conclusions* reached by the other experts" had not been relied on by Walters, and they could not impeach his opinion in the absence of an adequate foundation as to the "substantive correctness of the other experts' conclusions." *Id*. (emphasis added). Because no such foundation had been established, "the conclusions of [the] nontestifying experts were inadmissible under rule 705 either as the facts and data on which the testifying expert based his opinion or as impeachment evidence." *Id*. at 547.

We find the reasoning of *Bryan*, which we endorsed in *Phillips*, to be persuasive and dispositive in this case. Here, "the excerpts proffered by [defense] counsel from the [police] report[]"—which consisted of the author's opinion as to the cause of the accident—"lacked any independent guarantee of trustworthiness that would justify dispensing with cross-examination" of the report's author, and there was likewise no effort to "qualify[]" as an expert the person "who rendered" that opinion. 566 F.2d at 546. As Plaintiffs noted in their motion *in limine*, the report does not provide any basis for the conclusions that it reached other than the statements made by the bus driver (Defendant Conlon) and one of the bus passengers. Nor does the report provide any information as to the qualifications of the author to render an

expert opinion as to the cause of the accident.[5]  An opinion rendered by a person of unknown qualifications and contained in a report that, without any other explanation, relies uncritically on the hearsay statements of only selected witnesses and that does not expressly take account of, or address, any other relevant considerations, does not bear sufficient indicia of reliability and trustworthiness to be admitted as a competing expert "opinion" that a testifying expert may be required to address on cross-examination.

Defendants note that *Bryan* suggested that a report's conclusions might be admissible where "an uninterested, expert third party prepared the report," 566 F.2d at 546 (citing *Challoner v. Day & Zimmermann, Inc.*, 512 F.2d 77 (5th Cir.), *vacated on other grounds*, 423 U.S. 3 (1975)), but this argument is unavailing.  Although the author of the ADPS report was "uninterested," there was no basis to conclude that he was qualified as an "expert."  Moreover, there is no indication in *Challoner* that there was any dispute as to the validity of the underlying methods used by the government agents who conducted the tests that were described in the reports at issue in that case.  *See Challoner*, 512 F.2d at 83.  Here, as in *Bryan*, the validity of the methodology used in the relevant report *was* disputed and, in the present case, that validity was not established.

Moreover, as in *Bryan*, the fact that Walters, the testifying expert, had *read* the police report did not provide sufficient grounds, without more, to cross-examine him about its competing conclusions.  Walters never stated that "he relied on the *conclusions*" reached in the report, as

---

[5] The conclusions of the report's author cannot be deemed to be admissible lay opinion, because they are not "limited to one that is . . . rationally based on the [author's] perception."  FED. R. EVID. P. 701.

opposed to the "empirical data contained in the reports." *Bryan*, 566 F.2d at 546 (emphasis added).  Nor did Walters open the door to cross-examination about the report's competing conclusions by, for example, affirmatively bringing up those conclusions and attacking them.  *Cf. Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 157 (4th Cir. 1995) (holding that, where a testifying expert stated on direct examination that "he had read all of these non-testifying experts' depositions and disagreed with the experts' opinions," the district court did not abuse its discretion in permitting cross-examination "as to why he rejected those opinions," even though that introduced "what otherwise would have been inadmissible hearsay").  Under these circumstances, the report's *opinions*—as opposed to its underlying factual data based on the officer's observations—could only provide proper grist for cross-examination if an adequate foundation were laid to establish "the substantive *correctness*" of those conclusions.  *Bryan*, 566 F.2d at 546 (emphasis added).  Here, no such foundation appears in the record.

In arguing for a contrary conclusion, Defendants relied heavily on the Eighth Circuit's opinion in *Ratliff v. Schiber Truck Co.*, 150 F.3d 949 (8th Cir. 1998).  In *Ratliff*, defense counsel's cross-examination of the plaintiff's expert on accident reconstruction elicited the fact that the state trooper's report of the accident opined that, if the plaintiff had not been speeding, the accident would not have occurred.  *See* 150 F.3d at 953.  The Eighth Circuit held that the district court did not abuse its discretion in allowing the cross-examination.  *See id*. at 955.  The court held that it did not matter whether the author of the police report was qualified as an expert and that the cross-examination was proper simply because the testifying expert had "reviewed"

the police report and the "report" was a "document of the type reasonably relied upon by accident reconstructionists in forming their opinions." *Id*.

We reject the Eighth Circuit's undifferentiated analysis, which ignores the unique concerns that we and the Fifth Circuit have identified with respect to cross-examining experts about contrary opinions that are contained in hearsay documents and that lack any adequate foundation as to their reliability or validity. The fact that accident reconstructionists rely on police "reports" does not automatically mean that everything included in such a report is, without more, fair game for cross-examination. As *Bryan* explains, there is a critical difference between relying on the "empirical data contained" in a report and relying on the contrary "conclusions" contained in that report. 566 F.2d at 546. Defense counsel's cross-examination in the instant case did not establish that Plaintiffs' experts had relied on the opinions in the ADPS report and, on this record, they could not have established that. *See Phillips*, 534 F.3d at 1012 (holding that "reports of other experts cannot be admitted even as impeachment evidence unless the testifying expert based his opinion on the hearsay in the examined report or testified directly from the report").[6]

---

[6] The dissent makes the same mistake, erroneously concluding that cross-examination was proper under Rule 705 because Plaintiffs' experts supposedly relied on a "competing *conclusion* that they reviewed and *that is of a kind that is reasonably relied upon by other experts*." *See* Dissent at 49 (emphasis added); *see also id*. at 52 (asserting that the cross-examination allowed here was proper because "that *opinion* is of a kind reasonably relied on by other experts in the field" (emphasis added)). As we have explained, Defendants' counsel simply did not establish that Plaintiffs' experts had relied on the *opinions* in the ADPS

Moreover, the risk of unfair prejudice is substantial when, as here, a party is allowed to cross-examine a properly qualified expert with a contrary opinion rendered by a person whose qualifications, methods, and reasoning have not been adequately established.  *See* FED. R. EVID. 403.  The careful strictures that Rule 702 sets on expert testimony would be substantially undermined if, in cross-examining an expert, a contrary expert opinion that the testifying expert has read and rejected can be placed before the jury with insufficient foundation as to its adequacy.  The risk of unfair prejudice is particularly great where, as here, the contrary opinion was rendered by a law enforcement or other government official, inasmuch as—without any adequate foundation—it puts the imprimatur of the State behind the contrary view.  Indeed, that seemed to be the *only* purpose served by the cross-examination here.  Nothing in the principles described above prevented defense counsel from exploring, in appropriate cross-examination, why the testifying expert rejected other competing substantive explanations for how the accident occurred.  But it is quite another matter to put before the jury, without proper foundation, the additional fact that *a particular person who studied the matter reached the opposite conclusion*.[7]  In such circumstances, the risk of

---

report, nor did counsel establish that those (unexplained) opinions were the kind of facts upon which experts would reasonably rely in forming their own opinions.

[7] The dissent is therefore wrong in contending that our decision would broadly preclude cross-examination as to alternative explanations or methodologies that were affirmatively considered and rejected by a testifying expert.  *See* Dissent at 51–52.  Here, the ADPS report did not meaningfully explain its methodology, and it instead appeared to rely on uncritical acceptance of the statements of Conlon and one passenger.  *See supra* at 27–28.  Plaintiffs' experts were examined and cross-examined

unfair prejudice greatly outweighs the meager probative value of this limited fact.

Accordingly, we hold that the district court abused its discretion in allowing defense counsel, on cross-examination of Plaintiffs' experts, to elicit the contrary conclusions about the cause of the accident in the ADPS report.

## C

"[W]hen reviewing the effect of erroneous evidentiary rulings, we will begin with a presumption of prejudice." *Obrey v. Johnson*, 400 F.3d 691,701 (9th Cir. 2005). Here, Defendants have failed to carry their burden to establish that "it is more probable than not that the error did not materially affect the verdict." *United States v. Bailey*, 696 F.3d 794, 803 (9th Cir. 2012) (citation omitted); *see also id*. (stating that the "burden to show the harmlessness of the error is on the party benefitting from the error").

As noted earlier, the central contested issue in the case concerned how the accident happened, and the parties' competing experts drew sharply different conclusions as to the cause of the accident. Moreover, Plaintiffs' experts' analysis played an important role in Plaintiffs' argument as to why the eyewitness accounts of the bus passengers who testified were not reliable. And, as we have explained, the introduction of the fact that the ADPS had sided with the defense theory—without any foundation as to the qualifications of the person rendering that opinion, the

---

as to why they did not accept those witnesses' statements at face value, and in that sense the "methodology," so to speak, of the ADPS report *was* explored on cross-examination. But the further, gratuitous fact that this view had been accepted by the author of the ADPS report added little (if any) probative value, and it was highly prejudicial.

reasoning behind that opinion, or the reliability of the methods used in reaching it—did nothing more than put the State's imprimatur on the defense side.  In addition, Defendants' counsel exploited the error by making the ADPS's endorsement of the defense theory a centerpiece of his closing argument.  Under these circumstances, we cannot say that the error was more likely than not harmless.  Accordingly, we reverse and remand for a new trial.

# III

Although we reverse the judgment rendered after trial, we must still address Plaintiffs' argument that the district court erred in its pretrial ruling dismissing the additional claims that had been asserted solely under Navajo law, including claims involving additional parties.  The district court concluded that, because Arizona law governed the claims arising from the accident, any such claims based on Navajo law failed as a matter of law.  Reviewing de novo, *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 949 (9th Cir. 2019), we agree that Arizona law applies rather than Navajo law.

The Supreme Court has held that, as a matter of federal law, there are certain limited circumstances in which an Indian tribe may assert adjudicative jurisdiction and legislative jurisdiction over the actions of nonmembers of the tribe within the boundaries of the tribe's reservation.  *See Strate v. A-1 Contractors*, 520 U.S. 438, 445–53 (1997); *Montana v. United States*, 450 U.S. 544, 565–66 (1981).  We held in our prior ruling in this same matter that the Navajo Nation lacks *adjudicative* jurisdiction over Plaintiffs' claims against Defendants.  588 F. App'x at 722; *see also Strate*, 520 U.S. at 454–59 (holding that Indian tribes generally lack jurisdiction to adjudicate claims against nonmembers arising

from traffic accidents that occur on state or federal highways running through an Indian reservation). Because, as a general matter, a tribe's "legislative and adjudicative jurisdiction are coextensive," *Big Horn Cnty. Elec. Cooperative, Inc. v. Adams*, 219 F.3d 944, 950 (9th Cir. 2000), it follows that these federal law principles do not grant the Navajo Nation jurisdiction to prescribe the substantive legal rules governing this traffic accident.

Given that the special federal-law rules governing tribal jurisdiction do not confer legislative jurisdiction on the Navajo Nation in this case, the governing substantive law in this diversity suit must be determined under the ordinary rules applicable under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).[8] Accordingly, in determining what law that governs this case, the district court was required to "apply the substantive law of the forum in which the court is located, including the forum's choice of law rules." *Insurance Co. of N. Am. v. FedEx Corp.*, 189 F.3d 914, 919 (9th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). We are aware of no Arizona authority that has addressed whether the traditional choice-of-law rules that Arizona applies in determining which *States'* laws should apply to a given dispute may also be invoked in arguing for application of *tribal* law. Defendants argue, and the district court appeared to agree, that invocation of Arizona choice-of-law rules is inappropriate

---

[8] Contrary to what Plaintiffs contend, nothing in federal law requires a departure from these principles. Congress's declaration of purpose in authorizing funds to construct roads within the Navajo reservation, *see* 25 U.S.C. § 631 (2012 ed.), does not provide any basis for displacing state law that would otherwise be applicable under *Strate*. Nor does this case involve jurisdiction obtained by a State through coercion of a tribe's consent to such jurisdiction. *See Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877 (1986).

vis-à-vis tribal law and that there is therefore no basis for declining to apply Arizona substantive law here. Plaintiffs acknowledge the lack of directly controlling caselaw on this question, but they point to academic commentary endorsing the notion that "[a]pplication of choice-of-law principles will sometimes lead state and federal courts to apply tribal law[ ]." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 7.06[2] (2012 ed.). We need not resolve this issue. Even assuming that Arizona choice-of-law principles may be applied in addressing an argument that *tribal* law should be applied rather than Arizona law, those principles favor the application of Arizona substantive law here.

Arizona courts generally follow the Second Restatement of Conflict of Laws in determining the applicable law in a tort case. *See Pounders v. Enserch E&C, Inc.*, 306 P.3d 9, 11 (Ariz. 2013); *Bates v. Superior Ct.*, 749 P.2d 1367, 1369 (Ariz. 1988). Under the Restatement, the applicable law with respect to "an issue in tort" is that of the jurisdiction "which, with respect to that issue, has the most significant relationship to the occurrence and the parties." RESTATEMENT (SECOND) OF CONFLICT OF LAWS ("RESTATEMENT") § 145(1). In actions for personal injury or wrongful death, the law of the place "where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other [jurisdiction] has a more significant relationship . . . to the occurrence and the parties." RESTATEMENT §§ 146, 175; *see also Pounders*, 306 P.3d at 11; *Bates*, 749 P.2d at 1369–70. In assessing which jurisdiction has the more "significant relationship," a court applying the Restatement must consider several factors, including the "place where the injury occurred"; the "place where the conduct causing the injury occurred"; the "domicile, residence, nationality, place

of incorporation and place of business of the parties"; and the "place where the relationship, if any, between the parties is centered." *Bates*, 749 P.2d at 1370 (quoting RESTATEMENT § 145). The application of these factors "is qualitative, not quantitative." *Id*. "The court must evaluate the contacts 'according to their relative importance with respect to the particular issue.'" *Id*. (quoting RESTATEMENT § 145(2)).

The first two factors—the "place where the injury occurred" and the "place where the conduct causing the injury occurred"—both favor Arizona law. Although the accident occurred within the boundaries of the Navajo reservation, Arizona's right-of-way over U.S. Highway 160 renders the highway equivalent, "for nonmember governance purposes, to alienated, non-Indian land." *Strate*, 520 U.S. at 454 (footnote omitted). For purposes of a suit against nonmembers, we therefore deem the location of the accident and the injuries as being within Arizona's jurisdiction and not the Navajo Nation's. The third factor— "[t]he domicile, residence, nationality, place of incorporation and place of business of the parties"—weighs in favor of Navajo law because Plaintiffs are domiciled in the Navajo Nation and none of the Defendants are domiciled in Arizona. *Bates*, 749 P.2d at 1371. The fourth factor—the "place where the relationship, if any, between the parties is centered"—is irrelevant here, because the parties had no pre-existing relationship. *Pounders*, 306 P.3d at 15. On balance, we conclude that these factors weigh in favor of applying Arizona law.

Consequently, Arizona law applies unless the "general factors" concerning choice of law that are contained in § 6 of the Restatement warrant a different result. *Bates*, 749 P.2d at 1371; *see also Pounders*, 306 P.3d at 15. These

factors include (1) "the needs of the interstate and international systems"; (2) "the relevant policies of the forum"; (3) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue"; (4) "the protection of justified expectations"; (5) "the basic policies underlying the particular field of law"; (6) "certainty, predictability, and uniformity of result"; and (7) "ease in the determination and application of the law to be applied." RESTATEMENT, § 6(2). Several of these factors have little, if any, relevance here. Because the parties have not identified any respect in which the relationship between the Navajo Nation and Arizona would be affected by the choice of law, the first factor—the needs of the interstate system—is neutral. And because "accidents are not planned," the fourth and sixth factors— the "protection of justified expectations" and "certainty, predictability, and uniformity of result"—are essentially irrelevant here. *Bryant v. Silverman*, 703 P.2d 1190, 1195– 96 (Ariz. 1985). The key factors are the remaining ones— *viz*., the relevant tort-law policies of Arizona and the Navajo Nation, their relevant interests in applying their law to this dispute, and the ease of determining and applying the relevant law.

Both Arizona law and Navajo law provide compensation to injured victims and allow punitive damages in negligence cases. *Bryant*, 703 P.2d at 1195–96; *Cummings v. Yazzie*, 7 Navajo Rptr. 479, 484–89 (Navajo D. Ct. 1996). The only substantive differences that the parties have clearly identified between Arizona law and Navajo law are that (1) the latter permits a wider range of plaintiffs to sue for wrongful death and also permits recovery for the wrongful death of an unborn child who is not yet "viable," *cf. Summerfield v. Superior Ct.*, 698 P.2d 712, 724 (Ariz. 1985)

(holding that the Arizona wrongful death statute authorizes a cause of action for a "stillborn, *viable* fetus" (emphasis added)); and (2) Navajo law, according to Plaintiffs, permits direct recovery against insurers. The differences in substantive law concerning *damages* weigh in favor of Navajo law. The Arizona Supreme Court has held that issues concerning the compensation of an injured tort plaintiff are "primarily a concern of the [jurisdiction] in which [the] plaintiff is domiciled." *Bryant*, 703 P.2d at 1194. Moreover, Arizona has at best a weak interest in limiting the liability of non-Arizona defendants who would face greater liability under the law of another jurisdiction in which defendants are *also* not domiciled. *Id*. at 1196 (holding that Colorado has "no" interest in protecting an Arizona resident defendant from the law of its Arizona domicile, even for an accident occurring in Colorado).

By contrast, the difference in the availability of an action against insurers weighs in favor of Arizona law. As Plaintiffs acknowledge, the availability of such a claim is not entirely settled under Navajo law; indeed, Plaintiffs argue that it might warrant certification to the Navajo Nation Supreme Court. Moreover, in a footnote in their appellate brief, Plaintiffs further state that there is uncertainty as to whether Navajo law would apply a heightened standard of care in a case such as this one, and concede that this issue too may warrant certification to the Navajo Supreme Court. These acknowledged uncertainties as to the content of Navajo law implicate the Restatement factor addressing the "ease in the determination and application of the law to be applied," and they weigh heavily in favor of applying Arizona law. RESTATEMENT, § 6(2)(g).

We conclude that, considered as a whole, the general factors in Restatement § 6 do not warrant reaching a

different conclusion from the one that follows from an evaluation of the specific factors to be considered in tort cases under § 145 of the Restatement. *See Bates*, 749 P.2d at 1371. On this basis, we affirm the district court's conclusion that Arizona law applies and its resulting dismissal of all claims that were asserted below only under Navajo law.

## IV

Finally, Plaintiffs challenge the district court's refusal to hold that, as a matter of law, Conlon's negligence proximately caused the accident. In ruling on Plaintiffs' motion for summary judgment, the district court held that, by "mov[ing] from the right lane to the left lane" of the westbound portion of Highway 160, Conlon had, "as a matter of law . . . breached his duty to stay in the right lane and violated [Arizona Revised Statutes] Section 28-721."[9]

---

[9] At the time of the accident, § 28-721 provided:

A. On all roadways of sufficient width, a person shall drive a vehicle on the right half of the roadway except as follows:

1. When overtaking and passing another vehicle proceeding in the same direction under the rules governing the movement.

2. When the right half of a roadway is closed to traffic while under construction or repair.

3. On a roadway divided into three marked lanes for traffic under the rules applicable on the roadway.

4. On a roadway designated and signposted for one-way traffic.

B. On all roadways, a person driving a vehicle proceeding at less than the normal speed of traffic at the time and place and

The district court nonetheless denied summary judgment to Plaintiffs on the further issue of whether that breach was a *proximate cause* of the accident, holding that a reasonable jury could resolve that causation issue in favor of either party.  At trial, Plaintiffs renewed their proximate causation arguments in seeking judgment as a matter of law under Rule 50(a) and Rule 50(b), but the district court denied those motions.  On appeal, Plaintiffs challenge both the district court's denial of summary judgment and the district court's denial of judgment as a matter of law.

## A

As a threshold matter, we agree with Defendants that, under *Ortiz v. Jordan*, 562 U.S. 180 (2011), we may not review the district court's denial of summary judgment on the causation issue and that we are instead limited to reviewing only the denial of Plaintiffs' comparable arguments in its Rule 50 motions at trial.

The normal rule is that, "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Ortiz*, 562 U.S. at 184.  Accordingly, where an actual trial has intervened between the summary judgment ruling and the final judgment on appeal, any claim that the evidence is

---

under the conditions then existing shall drive the vehicle in the right-hand lane then available for traffic or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into a private road or driveway.

ARIZ. REV. STAT. § 28-721 (1996).  The district court's order did not specify whether it based its finding of negligence per se on paragraph A or paragraph B.

insufficient to support a verdict in one side's favor "must be evaluated in light of the character and quality of the evidence received in court" at that trial. *Id*.; *see also Dupree v. Younger*, 598 U.S. 729, 735–36 (2023) (reaffirming this aspect of *Ortiz* and holding that "an appellate court's review of factual challenges after a trial is rooted in the complete trial record, which means that a district court's factual rulings based on the obsolete summary-judgment record are useless"). Accordingly, under *Ortiz*, we may not review Plaintiffs' argument that, in applying Arizona causation standards at summary judgment, the district court misapplied those standards "in the context of the relevant facts." Instead, we must review these issues in light of the record developed *at trial* and in the context of Plaintiffs' Rule 50 motions raising comparable issues.

Plaintiffs contend that the causation issues that they raised at summary judgment qualify as "purely legal" issues that are not subject to *Ortiz*'s rule under our decision in *Booker v. C.R. Bard, Inc.*, 969 F.3d 1067, 1072 (9th Cir. 2020). *See also Dupree*, 598 U.S. at 735, 738 (holding that "purely legal issues resolved at summary judgment" are not subject to *Ortiz*'s rule and instead "merge into the final judgment, at which point they are reviewable on appeal"). That is wrong. As *Dupree* explains, "a purely legal question is, by definition, one whose answer is independent of disputed facts" and as to which "factual development at trial will not change the district court's answer." *Id*. at 737. The causation issues raised by Plaintiffs at summary judgment were *not* clean legal issues that can be meaningfully separated from one's understanding of the underlying facts concerning how the accident occurred. Because the record concerning those facts changed from summary judgment to the trial, the factual record at summary judgment is

"obsolete" and cannot provide the basis for our review of those issues. *Id*. at 736. If Plaintiffs are correct in contending that the issue of proximate causation should have been resolved in their favor as a matter of law in this case, that argument can only be assessed, under *Ortiz* and *Dupree*, in the context of the factual record develop at trial and in the context of the contentions Plaintiffs made in their Rule 50 motions.

**B**

Despite our decision to reverse the judgment for Defendants on other grounds, we will proceed to review Plaintiffs' arguments concerning their Rule 50 motions. We do so for two reasons. First, if Plaintiffs are correct that, notwithstanding any other error, they should have been granted judgment as a matter of law at the jury trial, then there should be no remand for a new trial on liability. Second, the causation issues, which have been fully briefed in this court, would arise again on any remand, and the parties and the district court would benefit from our guidance on those issues. Turning to the merits of those questions, we hold that the district court properly denied Plaintiffs' motions for judgment as a matter of law.

To establish negligence under Arizona law, "a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). "The negligence complained of need not be the sole cause, but need only be a proximate cause to support a verdict for the plaintiff." *Ariz. State Highway Dep't v. Bechtold*, 460 P.2d 179, 183 (Ariz. 1969). "The proximate

cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040, 1047 (Ariz. 1990) (citations omitted).  In denying Plaintiffs' Rule 50(b) motion, the district court held that a reasonable jury could find that Johnson crossed over into Conlon's lane and that Johnson's actions in doing so constituted an unforeseeable intervening cause that would permit the jury to find that Conlon's negligence in driving in the left lane was *not* the proximate cause of the accident. Plaintiffs raise two principal arguments in challenging this ruling, but neither has merit.

Plaintiffs argue that, contrary to the district court's reasoning, Johnson's asserted action in crossing into the left westbound lane cannot be deemed to be an "intervening" cause given that Conlon *continued* to negligently drive in that left lane up to the time of impact.  *See Zelman v. Stauder*, 466 P.2d 766, 769 (Ariz. Ct. App. 1970) (stating that "where defendant's negligent course of conduct (as distinguished from the risk of harm created) actively continues up to the time the injury is sustained, then any outside force which is also a substantial factor in bringing about the injury is a concurrent cause of the injury and never an 'intervening' force").  As Plaintiffs note, the Arizona statute that was the basis for the district court's negligence per se finding prohibits "*driving* a vehicle" in the wrong portion of the road, not merely the initial act of *moving into* that portion. This argument fails because it overlooks the competing duty that arose under Arizona Revised Statues § 28-729(1) when Wisner's Chevy Tahoe moved into the right-hand lane next to Conlon's bus.  That statute requires a driver to stay "within a single lane" and "not move the vehicle from that

lane until the driver has first ascertained that the movement can be made with safety." ARIZ. REV. STAT. § 28-729(1). On the record at trial, a reasonable jury could find that, once the Tahoe moved next to the bus, Conlon could no longer move with safety into the right lane and that it would then have been negligent, and a clear violation of § 28-729(1), for him to have attempted to do so. Under this view of the evidence, Conlon's "negligent *course of conduct*" in violation of § 28-721 "terminated" once his superseding duty under § 28-729(1) arose. *Zelman*, 466 P.2d at 769. On this basis the jury could permissibly find that Conlon's earlier negligence per se had terminated and that Johnson's actions therefore constituted an "intervening" cause.

Plaintiffs also argue that even if Johnson's actions were an *intervening* cause, they were not unforeseeable. "Under Arizona law as developed in negligence cases, an intervening cause does not relieve an earlier actor of liability if the intervening cause was reasonably foreseeable." *d'Hedouville v. Pioneer Hotel Co.*, 552 F.2d 886, 893 (9th Cir. 1977). Thus, "an intervening force becomes a superseding cause only when its operation was both unforeseeable and when with the benefit of 'hindsight' it may be described as abnormal or extraordinary." *Rossell v. Volkswagen of Am.*, 709 P.2d 517, 526 (Ariz. 1985). Because, according to Plaintiffs, the very purpose of § 28-721's stay-on-the-right rule is to avoid head-on collisions with traffic coming in the other direction, *see United Dairymen of Ariz. v. Fisher-Miller Hay & Dev. Co.*, 609 P.2d 609, 612 (Ariz. Ct. App. 1980), Johnson's actions must be deemed to be reasonably foreseeable as a matter of law. This argument's focus is too myopic. Although Conlon's original decision to proceed in the left lane was concededly negligent, a reasonable jury could find that it was not

reasonably foreseeable that Johnson's vehicle would enter that lane at precisely the moment in which Conlon could not safely change lanes. The issue of causation was properly submitted to the jury.

## V

For the foregoing reasons, we affirm the judgment in Defendants' favor to the extent that it dismissed all claims, including claims involving additional parties, based on Navajo law. We reverse the judgment on the remaining claims that were submitted for trial, and we remand for a new trial.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

WALLACE, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues that Arizona state law governs this diversity action and that the district court did not err in denying the Plaintiffs' motion for judgment as a matter of law. However, I disagree with my colleagues on their resolution of the evidentiary question. The majority opinion vacates and remands for a new trial, concluding that an expert may be cross-examined on conclusions contained within an inadmissible report that the expert reviewed and rejected only if those conclusions have an independent, sufficient guarantee of trustworthiness. For the following reasons, I respectfully dissent on that issue and would affirm the district court.

I.

The proper extent of cross examination of an expert witness begins with the scope of materials that an expert reviewed.  Federal Rule of Evidence 703 provides that an expert witness may base his or her opinion on inadmissible "facts or data," provided that "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion."  Fed. R. Evid. 703.  The inadmissible "facts or data" that experts may consider include the reports, opinions, and conclusions of other non-testifying witnesses. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262–63 & n.14 (9th Cir. 1984) (holding that an expert accountant may base his opinion on facts and conclusions contained in audit reports that are otherwise inadmissible); *see also* Fed. R. Evid. 703 advis. comm. note, 56 F.R.D. 183, 283 (1973) (approving of an expert physician who "bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients, reports and opinions from nurses, technicians, and other doctors, hospital records, and X rays").  Any facts, data, and conclusions that an expert considers and relies upon are not admissible as substantive evidence, but "solely as a basis for the expert opinion."  *United States v. Sims*, 514 F.2d 147, 149–50 (9th Cir. 1975); *see also Paddack*, 745 F.2d at 1262–63 (holding that materials underlying an expert's report were "admissible *only* for the limited purpose of explaining the basis of [the expert's] testimony").

Trial judges have a limited role in determining whether the underlying inadmissible facts, data, and conclusions reviewed were appropriate to consider.  Once a court makes the legal determination that the facts or data are of a "type" reasonably relied on by other experts, a qualified expert is left to determine how much weight—if any—to give those

facts and data when formulating his or her opinion. *See United States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007) ("The expert is, in the first instance, the judge of what resources would help him to form an opinion, and he can filter out as irrelevant prejudicial information."); *Sims*, 514 F.2d at 149 (holding that courts "should . . . leave to the expert the assessment of the reliability of the statements on which he bases his expert opinion"). This principle is premised on the notion that a qualified expert is "fully capable of judging for himself what is, or is not, a reliable basis for his opinion." *Sims*, 514 F.2d at 149; *see also Manocchio v. Moran*, 919 F.2d 770, 780 (1st Cir. 1990) ("Rule 703 reflects a recognition of the expert's integrity and specialized skill, which 'will keep him from basing his opinion on questionable matter.'"), *quoting* Weinstein's Evidence § 803(4)[01] at 803-146 (1990). In other words, Rule 703 trusts primarily the qualified expert to "separate the wheat from the chaff" and to use only reliable, reputable sources. *Sims*, 514 F.2d at 149. No further judicial guarantee of reliability is required.

Cross-examination is available to question the bases of the expert witness's opinion and to test the credibility and reliability of those bases. Federal Rule of Evidence 705 places the onus on the cross-examining attorney to elicit the "underlying facts and data" considered by the expert. *See* Fed. R. Evid. 705; *cf. Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). This rule further provides for cross-examination on "unfavorable" facts or opinions that were considered but ultimately disregarded or discounted by the expert. *See* Fed. R. Evid. 705 advis. comm. note, 56 F.R.D. 183, 286 (1973). In essence, the expert witness is subject to cross-examination to explain how and why he or she "separate[d] the wheat from the chaff." *Sims*, 514 F.2d

at 149.    With the benefit of cross-examination on the expert's decisional process, the trier of fact is "then capable of judging the credibility of the [expert] witness." *Id.*

There are limitations to cross-examination. A questioning attorney may only cross examine an expert witness on (1) subject matter discussed during direct examination or other "matters affecting the witness's credibility," as well as on (2) the "underlying facts and data" reviewed and considered by the expert. Fed. R. Evid. 611(b); Fed. R. Evid. 705; *see also Phillips v. E.I. DuPont de Nemours & Co. (In re Hanford Nuclear Res. Litig.)*, 534 F.3d 986, 1012 (9th Cir. 2008) (holding that an expert witness cannot be impeached with the reports of other experts "unless the testifying expert based his opinion on the hearsay in the examined report or testified directly from the report"). Moreover, the questioning attorney cannot elicit the inadmissible facts, data, and conclusions considered by the expert witness to prove substantive evidence, but only to "help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion." *Williams v. Illinois*, 567 U.S. 50, 78 (2012). Similarly, impeachment of the expert witness on the underlying materials considered "proves only that the declarant lacks credibility"; it does not prove the truth of the underlying facts, data, and conclusions. *Urooj v. Holder*, 734 F.3d 1075, 1078–79 (9th Cir. 2013), *quoting* Robert E. Jones, Federal Civil Trials & Evidence § 8:1954 (2013).

## II.

With these principles in mind, I would hold that the district court did not abuse its discretion in permitting the Defendants' counsel to ask the Plaintiffs' experts about the police officer's report and conclusions. The experts

reviewed the police officer's report and testified that such a report is of a kind on which experts in the field reasonably rely. The Plaintiffs did not argue otherwise at trial. As it is not disputed that such a report—including its facts and conclusions—is of a kind reasonably relied on by experts, and as the Plaintiffs' experts reviewed the report, it has sufficient reliability under Rule 703 to be considered and to be the subject of cross-examination under Rule 705. At least two other circuits to consider this question agree. *See Ratliff v. Schiber Truck Co., Inc.*, 150 F.3d 949, 955 (8th Cir. 1998) ("[The expert] admitted that he had read the report prior to submitting his own report. Therefore counsel was free to cross-examine the expert as to all documents he reviewed in establishing his opinion."); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 157 (4th Cir. 1995) ("Once [the expert] testified that he had read and rejected the other experts' out-of-court opinions on the source of the fire, defendants were free to explore the basis for that disagreement and to attempt to discredit [that] conclusion."). Such questioning was not admissible to provide the truth of the officer's report, but only to test the expert witness's credibility and decisional process. *See Sims*, 514 F.2d at 149–50; *Paddack*, 745 F.2d at 1262–63. The evidentiary rules do not demand any additional guarantees of reliability or trustworthiness at cross-examination.

## III.

The majority appears to agree with much of the general framework above. The majority accepts that expert witnesses may review and consider conclusions reached by other non-testifying individuals. The majority also agrees that testifying expert witnesses are subject to cross-examination on "unfavorable" materials that they considered and rejected. Yet the majority concludes that testifying

expert witnesses need not explain on cross-examination why they disagreed with a competing conclusion that they reviewed and that is of a kind that is reasonably relied upon by other experts unless the cross-examining attorney demonstrates that the competing conclusion has "sufficient indicia of reliability and trustworthiness."  Relying on a Fifth Circuit opinion to which our court cited once in passing, the majority holds that trial judges must now decide whether the bases underlying the competing, out-of-court report, and the qualifications of its author, pass muster.  Only then must a testifying expert speak to his or her review of and disagreement with the report's conclusions.

This holding imposes a heightened judicial reliability standard beyond what Rule 703 requires.  Once the testifying expert has been qualified, Rule 703 requires merely that a trial judge inquire into whether the underlying materials are of a "type" reasonably relied upon; the trial judge does not review the substantive sufficiency of each material considered.  *See Sims*, 514 F.2d at 149 (observing that Rule 703 rejected the previous rule that required inadmissible hearsay evidence relied upon by experts to be subject to "verification" before being presented to a trier of fact); *W.R. Grace*, 504 F.3d at 765.  Determining the substantive reliability of the underlying materials falls principally to the expert.  *See Sims*, 514 F.2d at 149 (holding that courts "should . . . leave to the expert the assessment of the reliability of the statements on which he bases his expert opinion"); *W.R. Grace*, 504 F.3d at 765.  The majority's rule invades the province of the expert and improperly supplants the expert with the trial judge.

In reaching this conclusion, the majority conflates non-substantive cross-examination evidence with substantive hearsay evidence.  The majority, relying on *Bryan*, requires

trial judges to determine the "substantive correctness" of the competing conclusion's methodology in order to deem that out-of-court conclusion "admitted as a competing expert 'opinion.'"  The Fifth Circuit in *Bryan* justified this rule by likening Rule 705 to an "exception[] to the hearsay rule," thereby requiring the trial judge to "comport[] with the concerns of the hearsay rule" and ensure sufficient trustworthiness and reliability before permitting cross-examination on a competing conclusion considered by the testifying expert.  566 F.2d 541, 545–46 (5th Cir. 1978).

However, cross-examination and impeachment regarding an underlying report reviewed and rejected by a testifying expert does not seek to substantively admit the out-of-court report as a Rule 702 expert opinion.  Rather, when a cross-examining attorney questions an expert witness on his or her consideration of the competing conclusions reached by another, this line of questioning is admitted only to test "the expert's thought process" and the expert's credibility.  *Williams*, 567 U.S. at 78; *Paddack*, 745 F.2d at 1262 n.11.  By requiring additional guarantees of reliability, *Bryan* and the majority's rule equates the cross-examination of the bases underlying an expert's opinion with the admission of substantive evidence used to prove the truth of the matter asserted.  This court should not restrict vigorous cross-examination merely because of unrelated and inapplicable concerns regarding the substantive admission of hearsay evidence.[1]

---

[1] The *Bryan* court's rule requiring an "independent guarantee of trustworthiness," which the majority adopts, bears striking similarity to Rule 807's residual exception to the hearsay rules.  *Compare Bryan*, 566 F.2d at 546 *with* Fed. R. Evid. 807 (requiring "sufficient guarantees of trustworthiness" under the residual exception to the hearsay rule).  This

The ultimate effect of the majority opinion's rule is to disarm cross-examining attorneys and shield testifying expert witnesses. Rule 705 places "the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination." *Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir. 1980) (internal quotation marks and citation omitted); *Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir. 1988) ("The burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the expert's opinion."). Under Rule 703, a qualified expert may consider and *rely on* the opinion of another, as long as that opinion is of a kind reasonably relied on by other experts in the field. *See Paddack*, 745 F.2d at 1262–63 & n.14. It disarms an opposing party if an expert could review and *discount* a conclusion of another but be shielded on cross-examination from explaining why that conclusion was reviewed and rejected.[2] *See generally United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991) ("Rule 703 creates a shield by which a party may enjoy the benefit of inadmissible evidence by wrapping it in an expert's opinion; Rule 705 is the cross-examiner's sword, and, within very broad limits, he may wield it as he likes."). This in turn hinders the jury, as the sole trier of fact and credibility, who is deprived of facts concerning how the testifying expert

further suggests that *Bryan* conflated the non-hearsay impeachment of facts and conclusions reviewed by an expert with the substantive admissibility of hearsay evidence.

[2] The majority's attempt to blunt the impact of its holding, by suggesting that some of the cross-examination that occurred here was permissible, merely underscores its intent to saddle the trial judge with additional gatekeeping responsibilities not contained in Rule 703.

"separate[d] the wheat from the chaff." *Sims*, 514 F.2d at 149.

## IV.

I turn now to Federal Rule of Evidence 403. As I have demonstrated, the majority opinion conflicts with generally applicable evidentiary principles concerning the impeachment and cross-examination of expert witnesses. Nonetheless, Rule 403 permits trial courts to exclude otherwise-permissible questioning if the probative value is substantially outweighed by the risk of unfair prejudice or influence. *See United States v. Hinkson*, 585 F.3d 1247, 1267 (9th Cir. 2009) (en banc). Exclusion under Rule 403 is an "extraordinary remedy to be used sparingly." *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995), *quoting United States v. Patterson*, 819 F.2d 1495, 1505 (9th Cir. 1987). This court must give "great deference" to a trial court's Rule 403 determination. *Hinkson*, 585 F.3d at 1267.

I cannot say that the district court abused its discretion under Rule 403. The district court granted "limited" cross-examination concerning how the expert arrived at his opinion following his review of the police report. While the fact that a police officer reached a competing conclusion may risk carrying the imprimatur of the State, the Plaintiffs' experts had ample opportunity to explain the weaknesses of the officer's report and the reasons why they disregarded the report. I agree that the Defendants' attorney acted improperly and attempted to put the substantive truth of the police report's conclusions before the jury, going so far as discussing the report's conclusions during closing argument. However, the solution to such gamesmanship is for the opposing party to request a Rule 105 limiting instruction and to object during closing arguments. *See generally W.R.*

*Grace*, 504 F.3d at 759 n.7.  The Plaintiffs did neither.  The Plaintiffs cannot now claim the benefit of their mistake and be granted a new trial on the theory that the Defendants' questioning was too prejudicial when they failed to request a limiting instruction that would have minimized the prejudicial effect of the questions.

## V.

"A district court is vested with broad discretion to make . . . evidentiary rulings conducive to the conduct of a fair and orderly trial." *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980).   For the above reasons, I conclude that the district court did not abuse its discretion in permitting the Defendants' counsel to cross-examine the Plaintiffs' experts on their consideration of a substantively-inadmissible competing opinion rendered by a police officer.  Once the experts reviewed the officer's report, and once the trial judge determined that the report was of a kind reasonably relied upon by other experts in the field, the report was sufficiently reliable to be considered and to be the subject of limited cross-examination.   Because I would affirm the district court in all respects, I respectfully dissent.